The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: **JUNE 5, 2024**

**No. A-1-CA-40886**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellee,

v.

**MARGARET CANO-SAMMIS a/k/a**
**MARGARET A. CANO-SAMMIS,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY**
**Daniel A. Bryant, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Aletheia V.P. Allen, Solicitor General
Albuquerque, NM

for Appellee

Gary C. Mitchell, P.C.
Gary C. Mitchell
Ruidoso, NM

for Appellant

**OPINION**

**WRAY, Judge.**

{1}     Defendant Margaret Cano-Sammis was on a daily regimen of marijuana and methadone to address numerous health issues. After a sleepless night caring for her brother, Defendant drove her brother to a doctor's appointment and on the way home, veered from the road, and struck and killed a seventy-eight-year-old great-grandmother (Victim). A jury convicted Defendant of homicide by vehicle (driving while under the influence of drugs), contrary to NMSA 1978, Section 66-8-101(A) (2016). Defendant's appeal centers on whether the district court properly admitted evidence concerning Defendant's alleged impairment by drugs. Defendant relatedly challenges the sufficiency of the evidence to support the conviction and the district court's rejection of Defendant's proposed jury instructions. Because we conclude that (1) the State established sufficient foundation for the admitted evidence, (2) the evidence supported the conviction, and (3) the district court properly refused Defendant's proposed jury instructions, we affirm.

**BACKGROUND**

{2}     In July 2017, Defendant was driving in Lincoln, New Mexico, when she veered off the road and struck Victim, who was walking with her family to visit a historical site. Accident reconstruction testimony established that Defendant's truck was travelling a minimum of fifteen miles-per-hour when it hit Victim and continued

for approximately thirty-one feet before hitting a parked car. The absence of tire marks indicated that the brakes on Defendant's truck did not engage. Victim's son testified that when he got to the truck, Victim was under a tire, and he yelled to Defendant to back the truck up. Victim died before paramedics arrived.

{3} Multiple law enforcement officers arrived at the scene, as well as paramedics who unsuccessfully attempted to resuscitate Victim. A Lincoln County Sheriff's deputy (the deputy) took Defendant's statement, and Defendant reported that she was driving slowly, and "the next thing that she remembered there were people yelling at her." The deputy asked whether Defendant had taken any medication, and Defendant responded that she had taken her prescribed methadone and marijuana that morning for pain. Results of a blood draw performed later that day confirmed the presence of marijuana and methadone in Defendant's bloodstream.

{4} A New Mexico State Police sergeant (the sergeant) arrived and conducted standard field sobriety tests (SFSTs) as well as two, alternate sobriety tests—the "estimate-thirty-seconds" test and the "finger-to-nose" test. The sergeant testified that he observed eyelid tremors while conducting the horizontal gaze nystagmus (HGN) test as well as during the alternate "estimate-thirty-seconds" test. He further testified that Defendant failed to follow instructions during the HGN and the walk-and-turn test, had difficulty maintaining balance, and consistently counted slowly, both during the one-leg stand test as well as during the "estimate-thirty seconds"

test. The sergeant's observations related to Defendant's performance on the SFSTs were recorded in the police report.

{5}     Before trial, Defendant filed a motion in limine to prohibit the State from offering into evidence any standards correlating an amount of marijuana in Defendant's system to impairment, because unlike blood alcohol levels, specific blood levels of marijuana, measured by the presence of the chemical THC, do not correlate to impaired driving. At the hearing on Defendant's motion, it became clear that Defendant contested not only the admission of the level of the THC in her system, but also all testimony and evidence that marijuana use causes driving impairment. The State's expert, the chief of the Forensic Toxicology Bureau of the New Mexico Department of Health (the expert), testified that studies observing marijuana and driving had shown "a significant difference between sober state, placebo state, and the drug state" in relation to maintaining a lane, a consistent following distance, and speed. Referring to marijuana, the expert stated that the studies "broadly" demonstrate that "the presence of these drugs can cause impairment." The State then proffered the expert to offer the opinion that in the present case, Defendant was impaired by marijuana based on the presence of marijuana in Defendant's blood in combination with other facts gleaned from the investigatory record. To support the position that no scientific evidence correlated marijuana use with impaired driving, Defendant referenced multiple studies and

articles. Defendant, however, relied on cross-examination at the hearing and declined to submit any evidence on the subject—including the articles and studies or expert testimony—to the district court. The district court requested additional briefing on whether a toxicologist could rely on an amount of marijuana present in blood together with "all of the other factors" in order to provide an opinion on impairment.

{6} The parties submitted the additional briefing, and the district court entered an order granting Defendant's motion in part and prohibiting the State from presenting testimony that a particular level of THC in the bloodstream equates to impairment. The district court did, however, allow the expert to provide an opinion that Defendant was impaired based on a combination of factors, which included the results of the blood draw, driving behavior, statements, and observations during the SFSTs.

{7} During the four-day jury trial, Defendant presented evidence that she suffered from a seizure disorder that manifested for the first time when her truck hit and killed Victim and that because of her brother's medical difficulties, she had been awake most of the night and was sleep deprived. The State argued that "her drugs caused her to fall asleep and drive off the road" and any "unconsciousness was due to the marijuana, it was due to the methadone, and that makes it criminal." Ultimately, the

4

jury found Defendant to be guilty of homicide by vehicle, and the district court imposed a nine-year sentence. Defendant appeals.

**DISCUSSION**

{8}     Defendant asks us to determine (1) that the district court improperly admitted evidence concerning Defendant's impairment by drugs, (2) whether sufficient evidence supported Defendant's conviction, and (3) whether the district court incorrectly rejected Defendant's proposed jury instructions. We begin with Defendant's challenge to the admission of the impairment evidence.

**I.      The District Court Did Not Abuse Its Discretion in Admitting the Evidence of Impairment**

{9}     Defendant first argues that the district court admitted unreliable evidence of impairment by marijuana and methadone. The admission of expert testimony and scientific evidence is "within the sound discretion of the [district] court and will not be reversed absent a showing of abuse of that discretion." *State v. Alberico*, 1993-NMSC-047, ¶ 58, 116 N.M. 156, 861 P.2d 192. A district court abuses its discretion only if its decision indicates a misapprehension of the law, *State v. Vargas*, 2016-NMCA-038, ¶ 10, 368 P.3d 1232, or is manifestly erroneous, arbitrary, unwarranted, or is "clearly against the logic and effect of the facts and circumstances before the court." *Alberico*, 1993-NMSC-047, ¶¶ 58, 63.

{10}     The admission of expert testimony and other scientific evidence is largely governed by Rule 11-702 NMRA. This rule has been interpreted by our courts to

require the proponent of expert testimony to satisfy three prerequisites for admissibility: (1) the expert is qualified; (2) the testimony proffered will assist the trier of fact; and (3) the testimony concerns "scientific, technical, or other specialized knowledge with a reliable basis." *State v. Yepez*, 2021-NMSC-010, ¶ 19, 483 P.3d 576 (internal quotation marks and citation omitted). The district court must exercise a "gate[]keeping function and ensure that the expert's testimony is reliable," *State v. Torrez*, 2009-NMSC-029, ¶ 21, 146 N.M. 331, 210 P.3d 228, so that "speculative and unfounded opinions do not reach the jury," *Yepez*, 2021-NMSC-010, ¶ 19 (internal quotation marks and citation omitted); *see also State v. Torres*, 1999-NMSC-010, ¶ 24, 127 N.M. 20, 976 P.2d 20 ("[I]t is error to admit expert testimony involving scientific knowledge unless the party offering such testimony first establishes the evidentiary reliability of the scientific knowledge."). In the present case, Defendant contends that the expert's opinion was not sufficiently scientifically reliable to demonstrate impairment by marijuana and methadone. Specifically, Defendant contends that the district court improperly allowed the State "to present results of a blood draw and . . . allow[ed] the State's 'expert' to state an opinion . . . [D]efendant was impaired" but "[a]fter assessing the lack of scientific research, the [district] court should have determined that more research is needed to determine a method for scientifically proving impairment for the use of marijuana/methadone."

{11}     We view the expert's opinion in two parts. First, the expert provided testimony that marijuana and methadone can cause driving impairment as measured by certain physical behaviors like sleepiness or focus problems. Second, the expert used that principle to further opine that Defendant's driving was impaired by marijuana and methadone based on an aggregate of information about Defendant's physical behaviors. The same analytical tools do not necessary apply to evaluate both of the expert's opinions. Under federal law and New Mexico law, the admissibility of scientific expert testimony is subject to a multifactor test, named for *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Alberico*, the *Daubert-Alberico* test. *See Yepez*, 2021-NMSC-010, ¶ 22. Federal and New Mexico law diverge, however, when expert testimony has its basis not in scientific knowledge but in experience and training. *See Torres*, 1999-NMSC-010, ¶ 44; *Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 19, 134 N.M. 421, 77 P.3d 1014 ("[W]e apply *Daubert* somewhat differently than do the federal courts.").

{12}     We review de novo whether the *Daubert-Alberico* standard applies. *See Torres*, 1999-NMSC-010, ¶ 28. This Court has explained that "[e]vidence is based on scientific knowledge if it is not self-explanatory, or if it is based on a scientific or medical principle." *State v. Aleman*, 2008-NMCA-137, ¶ 6, 145 N.M. 79, 194 P.3d 110 (internal quotation marks and citation omitted). The expert's opinion that marijuana and methadone use can cause driving impairment is rooted in whether a

substance can cause a particular response in the human body. This opinion "is based on principles of medicine and science not readily understandable to the jury." *See Torres*, 1999-NMSC-010, ¶ 31 (internal quotation marks and citation omitted). To establish the foundation for this opinion, the State was required to satisfy the *Daubert-Alberico* factors. The expert further testified, however, that Defendant was impaired based on a combination of (1) the scientific opinion that marijuana and methadone can cause certain physical responses and driving behaviors; and (2) the sergeant's observations during the SFSTs, Defendant's admission to taking marijuana and methadone, the presence of both drugs in Defendant's blood, and the circumstances of the collision. In *Aleman*, we determined that similar testimony was not scientific as contemplated by Rule 11-702 but was instead "specialized knowledge," which "while it may result in conclusions or opinions drawn from observations and experience with scientific facts, deals more with the technical application, rather than the theoretical application of facts." *See Aleman*, 2008-NMCA-137, ¶ 18 (internal quotation marks and citation omitted). Opinions based on specialized knowledge, and not "science," are not subject to *Daubert-Alberico*. *See State v. Ruffin*, 2019-NMCA-009, ¶ 21, 458 P.3d 445 (concluding that testimony fitting within the witness's specialized training did not arise from "scientific principles or mathematic computations" and therefore *Daubert-Alberico* did not apply). In the present case, therefore, the scientific evidence must satisfy the

*Daubert-Alberico* test and the remaining opinion testimony must meet the Rule 11-702 standard. *See Aleman*, 2008-NMCA-137, ¶ 17. We turn to the *Daubert-Alberico* test.

**A.      The Scientific Reliability of the Expert's Opinion That Marijuana Can Impair Driving**

{13}     We briefly explain why we address only the reliability of the expert's scientific opinion as to marijuana and not the reliability of the expert's opinion about methadone. Defendant's motion in limine focused only on marijuana, and at the pretrial hearing on the motion Defendant stated, "Let's keep it to marijuana today," suggesting that impairment by methadone was not at issue. Before trial, the district court clarified that because Defendant had challenged only the marijuana evidence, the rulings related only to the marijuana evidence: "I have not either granted testimony about methadone or excluded testimony about methadone. That will depend on the presentations and/or objections at the time of trial if there are any." At trial, Defendant argued that the studies did not show that methadone causes impaired driving when taken within therapeutic limits. Defendant did not offer any studies to the district court or argue that the expert should not be permitted to testify that methadone can cause driving impairment. Before the expert testified about the blood test results, Defendant objected for the record to the admission of both the marijuana and methadone results, but did not articulate a further basis for exclusion beyond the arguments already made—arguments that related to marijuana. The

9

expert testified that methadone can cause similar physical reactions in the body—drowsiness, slow reaction time, and the ability to make judgments. Though the expert did not discuss any specific driving studies related to the use of methadone, he did explain that the presence of both marijuana and methadone would cause "impairment by potentially both substances simultaneously" but would not "multiply and make [the impairment] much greater." Defendant cross-examined the expert about studies indicating that methadone taken within therapeutic limits did not impair driving. Because the pretrial focus was on marijuana and Defendant did not invoke a ruling specifically related to the scientific foundation for driving impairment caused by methadone, we limit our discussion to the scientific foundation for the evidence that marijuana can cause driving impairment.

{14}     On appeal, Defendant cites extensively to articles and studies to support her view that "there is no scientific method to determine impairment via marijuana and other tests used to show impairment due to alcohol do not work to show impairment due to marijuana use." At trial, Defendant used some studies in cross-examination to point out inconsistencies or uncertainties in the science about how these drugs affect the body and invited the jury to test the weight and credibility of the expert's opinion in light of that additional information. These studies and articles, however, are not part of our record on appeal and as stated above, were not offered to the district court to assist with the gatekeeping determination. As a result, we do not

consider them anew. *See State v. Knight*, 2019-NMCA-060, ¶ 22, 450 P.3d 462 ("[O]ur scope of appellate review is limited to a consideration of those facts disclosed by the record." (internal quotation marks and citation omitted)); *State v. Cordova*, 2014-NMCA-081, ¶ 14, 331 P.3d 980 ("[T]he argument of counsel is not evidence.").

{15}   To determine whether scientific knowledge is reliable, courts examine the *Daubert-Alberico* factors as follows:

>   (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*Yepez*, 2021-NMSC-010, ¶ 22 (internal quotation marks and citation omitted). To establish that marijuana can impair driving, the expert testified at the pretrial hearing about the complex nature of driving and the impact marijuana can have on a person's ability to drive safely:

>   State: Can marijuana impair driving?

>   Expert: Yes.

>   State: And can you talk to us about the science of how marijuana can impair driving?

>   Expert: So driving is . . . a complex task, right. It requires divided attention. You must look at the field of view around you, control your hands to steer the car safely, often operate your feet to push the accelerator or the brake. . . . So you need to have divided attention,

11

> ability in that you need to be able to view what is around you. You need to be vigilant. You need to have memory, right, remember what the speed limit is. . . . You must exercise sound judgment to avoid dangerous situations, to follow the laws.

In relation to the specific aspects of driving that could be affected by marijuana use, the expert explained that

> there have been multiple studies where marijuana has been dosed into healthy volunteers who are then given the task of driving on the open road with a kind of instructor car, or in a simulated driving environment. And in many of those studies there has been a measurable decrease in individual ability to be vigilant and to maintain divided attention to safely operate a motor vehicle. There can be other problems where if the dose of marijuana is very high, it can cause somebody to be very sleepy, which I think we can all understand of how being very sleepy can cause unsafe driving. So that's just a few of the areas where impairment by [marijuana] can negatively impact one's ability to safely operate a motor vehicle.

The expert testified about specific, published studies and described how those studies monitored sober, placebo, and drugged participants to measure observable behavior for impairment, including maintaining speed and lane positioning. The expert did not testify specifically to any rate of error associated with these studies or whether the results of these studies were peer reviewed, although at trial, the expert generally testified that his "education" is based on "peer reviewed journals that's also kind of aligned with what the court requires." In this respect, the State did not elicit the specific information required for the district court to perform its gatekeeping function as to all of the *Daubert-Alberico* factors. While the district court may inquire further and require more information from a party before

12

admitting expert testimony, *see State v. Lasworth*, 2002-NMCA-029, ¶¶ 17, 20-22, 131 N.M. 739, 42 P.3d 844 (determining the district court did not abuse its discretion in excluding expert testimony when the expert was not able to explain the scientific phenomena at issue to the district court's satisfaction), during cross-examination, Defendant conceded that marijuana can impair driving as follows: "You've stated that marijuana can impair driving, not too much question that it can't, question is whether it did." Under these circumstances, "deficiencies in calculating the rate of error sp[eak] to the weight of the evidence and not to its admissibility." *State v. Montoya*, 2016-NMCA-079, ¶ 26, 382 P.3d 948 (internal quotation marks and citation omitted). "[A]ny doubt regarding the admissibility of [expert opinion] evidence should be resolved in favor of admission, rather than exclusion." *Lee v. Martinez*, 2004-NMSC-027, ¶ 16, 136 N.M. 166, 96 P.3d 291.

{16}    For these reasons, we conclude that the district court did not abuse its discretion in considering and weighing the *Daubert-Alberico* factors that the parties put at issue and ultimately admitting the expert's opinion connecting marijuana and driving impairment.

**B.      The Expert's Opinion That Defendant Was Impaired**

{17}    The expert combined this scientific opinion on marijuana and driving impairment with additional evidence to form a broad opinion that Defendant was impaired by marijuana while driving. As we have explained, we do not subject this

broader opinion to *Daubert-Alberico* but instead consider the Rule 11-702 factors. Defendant does not argue that the expert was not qualified or that the opinion did not assist the jury—the first two elements of Rule 11-702. We therefore do not address whether a toxicologist is qualified to offer an opinion on impairment that is based on all of the evidence in the police report or whether such an opinion is helpful to the jury. Instead, we, like Defendant, focus on the third element. Defendant argues that the expert's opinion did not have a reliable basis because (1) the additional evidence presented at trial—SFST, HGN, and blood test results—is relevant only to identify alcohol-related impairment and not marijuana impairment; and (2) the expert's testimony only supported a conclusion that marijuana impairment was the "likely cause" of the collision, which encouraged the jury to rely on a single inference and improperly minimized other causation evidence, contrary to our Supreme Court's determination in *State v. Consaul*, 2014-NMSC-030, 332 P.3d 850. As we explain, however, the additional evidence was sufficiently related to marijuana impairment, and the expert's testimony was not similar enough to the expert testimony outlined in *Consual* to trigger the same concerns.

**1.      The Additional Evidence of Impairment**

{18}      As noted, Defendant contests that the additional evidence of impairment—particularly the presence of THC in the blood, the SFSTs, and the results of the HGN test—was unreliable. We address each in turn.

14

{19} The district court limited the expert's testimony about the blood test to the presence of an amount of THC and methadone in Defendant's blood. The expert did not testify that the level of THC in Defendant's bloodstream showed impairment and readily acknowledged that specific blood levels of these drugs do not directly correlate to impairment. Rather, the expert testified that the presence of marijuana in Defendant's blood was but one factor that he considered in making the determination that Defendant was impaired at the time of the collision. On cross-examination, the expert acknowledged that users of marijuana and methadone can develop tolerances to impairing effects, that marijuana has varying impacts on different people's motor performance, and that THC may remain in the blood residually for some period of time without causing impairment. The district court properly prevented the State from establishing impairment based solely on a THC blood level but appropriately permitted the expert to render an opinion on the presence of THC in Defendant's blood and Defendant to cross-examine that opinion. The weight and credibility of the opinion was for the jury to determine. *See Alberico*, 1993-NMSC-047, ¶ 96 ("The proper focus is whether the expert testimony is competent; then the trier of fact has the discretion to evaluate expert testimony just like any other admissible evidence.").

{20} The jury was also free to consider the import of the SFSTs. New Mexico courts have held that evidence about the administration of SFSTs is probative of

impairment by drugs and demonstrative of "common physical manifestations" of intoxication. *See State v. Randy J.*, 2011-NMCA-105, ¶ 34, 150 N.M. 683, 265 P.3d 734 ("[The] administration of [SFSTs] is a reasonable part of an investigation where the officer has reasonable suspicion that the person was driving under the influence of alcohol or drugs."); *Torres*, 1999-NMSC-010, ¶ 31 (recognizing that most SFSTs are self-explanatory and address "common physical manifestations of intoxication" (internal quotation marks and citation omitted)). This connection is borne out in the testimony at trial. The sergeant testified that during the SFSTs, Defendant had difficulty following instructions and slow responses. The expert explained that SFSTs are, by definition, divided attention tests and doing poorly on a SFST can indicate someone is having trouble with a driving task and may be impaired by drugs. As we have outlined, the expert discussed the physical manifestations of marijuana use—sleepiness, lack of vigilance, and difficulty with divided attention tasks. In the scientific studies, these symptoms manifested as driving impairment: difficulty maintaining a lane, speed, and distance between vehicles. Thus, Defendant's behavior during the SFSTs reflected the type of behavior that the expert correlated to both marijuana use and driving impairment.

{21} Defendant contends that a drug recognition evaluator (DRE) exam should have been performed, instead of only SFSTs, so that the jury could hear evidence of a drug-specific investigation and that a DRE exam was required by *Aleman*. In

16

*Aleman*, this Court "address[ed] the admissibility of the expert opinion testimony of a [DRE] regarding a 12-[s]tep [p]rotocol . . . , which is a process designed to enable law enforcement to identify (1) whether a subject's ability to operate a vehicle is impaired and (2) which category of drugs has affected a subject." 2008-NMCA-137, ¶ 1. Using training and experience, the officer makes a series of observations that are used to "document the physical signs that a person is impaired and to establish parameters for the toxicological tests [that] will ultimately confirm the presence of a particular substance in the subject's system." *Id.* ¶ 9. While we recognized in *Aleman* that evidence of DRE protocol results can assist a jury to determine whether a defendant is under the influence of a particular drug, *Aleman* does not set forth a mandatory procedure for law enforcement to use to determine impairment. *See id.* ¶ 19. In this case, Defendant admitted to using marijuana and methadone earlier that day, and so the DRE exam was not necessary to identify the drug at issue, which is the primary assistance a DRE exam provides to the trier of fact. *See id.* ("[A]lthough many jurors might be familiar with the individual symptoms that the DREs observed, we doubt that a typical juror would have had the detailed information about the correlation between these observations and a particular category of drug." (internal quotation marks and citation omitted)). We therefore cannot agree with Defendant's contention that *Aleman* requires compliance with a DRE protocol.

17

{22}   We last consider Defendant's challenge to the HGN testimony. A qualified law enforcement officer may testify as to the administration of an HGN test and any observations, but a scientific expert is required to establish how the test "proves" intoxication. *Torres*, 1999-NMSC-010, ¶¶ 40, 47. Defendant argues that the HGN testimony was improperly admitted not only because she maintains that HGN tests are not designed to measure marijuana impairment, but also because the results of such tests are affected by neurological conditions and no expert established the foundation for the admission of HGN results relating to eye movement. While we agree that the State did not establish the foundation to admit any expert opinion that the results of the HGN test were related to impairment by marijuana, based on the record before us, we discern no reversible error.

{23}   Before trial, Defendant questioned the expert about qualifications related to HGN testimony. When the district court asked Defendant to describe the potentially objectionable testimony, Defendant identified the sergeant's and the expert's testimony leading to an opinion about marijuana impairment—including the HGN. The district court's order permitted the expert to testify as to "all of the factors listed," which included the "officer's observations of the subject during the [SFSTs]." During trial, Defendant objected to the sergeant's testimony about the HGN test. The State responded that it would elicit testimony from the sergeant about his observations and from the expert about the foundational requirements for

scientific HGN testimony. The district court ruled that the sergeant could testify about what was observed but could not testify "about whether the [HGN] test indicated any impairment." The sergeant would "be able to talk about what he saw, including eyelid flutter, but whether or not that indicates impairment is going to be up to another witness."

{24} On direct examination, the sergeant described the HGN test, and Defendant objected as the sergeant began to explain what he was looking for. The district court cautioned the State to instruct the witness not to "go any further" than the observations that he made during the test. Regarding those observations, the sergeant testified as follows:

State: What were your observations of [Defendant] during this test?

Sergeant: I observed a—can I say nystagmus?

State: Well, can you describe what it is you observed?

Sergeant: When I move my finger in front of their face, both pupils—eyes—follow it smoothly, when I see a nystagmus, it's an involuntary jerking. It looks like the eyes kind of rolling over, little pebbles—twitches—as I move my finger in front of their face.

State: Did you observe that in [Defendant]?

Sergeant: I did. During smooth pursuit, which is two passes, I go this way, back this way, this way again, and this way again.

State: What else did you observe during this test?

Sergeant: I noticed eyelid tremors, top of her eyelid just fluctuating, twitching.

19

The sergeant testified that during the finger-to-nose test, he "noticed lid tremors again." In this testimony, the sergeant reported only his actions and observations and drew no conclusion about impairment, which is consistent with the district court's ruling and *Torres*. The expert then later testified as follows:

> State: Did the [sergeant] observe any clues in the horizontal gaze nystagmus test that were significant to as you looked at it and thought about possible impairment?
>
> Expert: I believe the [sergeant] observed nystagmus in both eyes.
>
> State: If the [sergeant] observed eyelid flutter, would that be significant to you?
>
> Expert: Yes.

No scientific foundation for the significance of HGN or eyelid flutter was established. Nevertheless, Defendant did not object at this point to the expert's testimony. The State moved on and did not refer to eye movement or HGN again. While this testimony was without foundation—and entirely without context for the jury—the district court did not have an opportunity to rule on the foundation for the *expert*'s brief testimony on the subject or to cure any prejudice by way of instruction. *See State v. Christmas*, 2002-NMCA-020, ¶ 16, 131 N.M. 591, 40 P.3d 1035 (acknowledging that a curative instruction is sufficient to cure prejudice resulting from inadmissible evidence, including HGN testimony); *see also* Rule 12-321 NMRA (requiring for preservation that "it must appear that a ruling or decision by

the trial court was fairly invoked" absent issues involving the general public interest, plain or fundamental error, or a party's fundamental rights).

{25} For these reasons we reject Defendant's individual challenges to the evidence on which the expert relied to form an opinion about impairment.

**2.     Defendant's Arguments Relating to *Consaul***

{26} Defendant argues that the admission of scientific evidence that only supports a "'likely cause' is never sufficient to support" a guilty verdict and is contrary to our Supreme Court's holding in *Consaul*. Specifically, Defendant contends that the principle set forth in *Consaul* prohibits evidence of "[t]aking a blood test and then concluding because there was an accident resulting in a death there is impairment" because such an inference undermines other "likely causes and the process of elimination and differential diagnosis." By this argument, Defendant challenges what she views as a "one size fits all" test, which minimizes the value of potential causes for the Victim's death other than impairment by marijuana—like Defendant's evidence regarding a newly diagnosed seizure disorder. We cannot agree.

{27} In *Consaul,* the relevant issue was whether the defendant intentionally smothered a child when he admitted to tightly wrapping the child and placing him face down to sleep. 2014-NMSC-030, ¶ 54. The expert testimony in that case provided the only evidence that the child "may have been smothered" and was not "injured by other, noncriminal causes." *Id.* ¶ 56. Because this expert testimony was

21

the only evidence to establish guilt beyond a reasonable doubt, our Supreme Court looked "deeper than mere admissibility" to determine whether that expert testimony was "sufficient to support a criminal conviction." *Id.* ¶ 57. In that context, when "[n]o doctor offered any kind of probability analysis" with the opinion that the child "was likely suffocated," the evidence fell "short of establishing proof beyond a reasonable doubt." *Id.* ¶¶ 71-72. The present case, however, did not involve only blood test results from which the expert inferred impairment, and the jury was not required to rely solely on the blood test to find Defendant guilty beyond a reasonable doubt.

{28}    As we have observed, the expert described the physical effects of marijuana—slow reaction time, diminished focus and attention, easy distraction, poor memory and recall—and acknowledged that while no set correlation between the level of THC in the bloodstream and driving impairment exists, THC levels in the blood can be considered as one factor. The expert testified that the impairment opinion was based on expertise in the field of toxicology and independent review of the raw data and conclusions about the presence of substances in Defendant's blood, as well as the conditions of the crash, the performance on the SFSTs indicating potential drug impairment, and Defendant's admission to using marijuana. The expert's multifaceted opinion is in line with the *Consaul* Court's general view of the admissibility of opinion evidence: "Generally, to be admissible an item of evidence

22

need only add something to the debate" and "no single piece of evidence has to carry the entire burden of proof especially in a criminal trial." *Id.* ¶ 67. We are therefore satisfied that the expert's opinion does not run afoul of the concerns raised by our Supreme Court in *Consaul*.

**C.     Admissibility of the Expert's Impairment Opinion**

{29}    Near the end of trial, Defendant lamented that "we're dealing with issues of science from experts in which there are conflicting studies and/or conflicting opinions based upon conflicting studies because the science has not reached the stage where it can be certain." Later, in the context of the motion for directed verdict, Defendant continued to express reservations about the admission of the evidence:

> Experts in the field don't know the answer, and we're just going to toss it to the jury, and say you guys decide. That's like a coin flip—this is not how we're supposed to run a criminal justice system. . . . We're giving this jury a case in which there's a strong argument she had a seizure, . . . perhaps she was too tired and needed more sleep or did these drugs have some impact—although the science says probably not. . . . She didn't fail one [SFST]. Looking at all that your honor, it just seems to me that what we're doing in this case—and this is not some evil case where we're talking about somebody went out and did something evil it seemed or somebody was mad at somebody or something like that—that's not this case at all. We're now taking a major felony case with a lot of years allowed by the Legislature. We're saying to the jury, you guys decide this, even though we're unsure of the science.

The district court articulated its directed verdict ruling while also addressing the need for the jury to resolve the conflict:

23

In this case, I've heard evidence that methadone . . . was consumed on the day of the accident. I've heard evidence that THC was consumed on the day of the accident. I've heard evidence from a state crime lab expert who did many of the DRE things—not 100 percent of the DRE things—but many of those, assessed the number of circumstances and that expert has testified that in his opinion the cause of the accident was impairment. What is not in dispute in this case at all is that there was an accident—that the accident caused the death. So the cause of death is not at issue here today. What's at issue here is two different theories about why the accident happened. The State's theory, impairment. The defense theory, medical emergency of some kind in the form of a seizure and/or exhaustion, etc., from the circumstances surrounding the events preceding the date. My ruling is that that dispute in the evidence—that issue in the evidence—is the quintessential jury question. It's not a question for a judge to say, "I believe this set of facts or I believe that set of facts," when ruling on a case. And so that's why I did not grant the directed verdict this morning, . . . that's the basis for the denial of the motion for a directed verdict either at the end of the State's case or now, and I make the same findings. I've heard evidence as to what happened to create the accident that a reasonable juror can conclude beyond a reasonable doubt that it was impairment that caused the accident. They might also conclude that there is a reasonable doubt based on this other theory. But I think that evidentiary dispute belongs in the hands of this jury.

It is well established that the appropriate means of attacking shaky, but admissible evidence" is "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Defendant engaged in thorough cross-examination of the expert at trial and presented evidence that rather than being impaired by marijuana, she had a seizure disorder that manifested for the first time on the date that Victim was killed. Accounting for the uncertainties in the science that were identified and explored at trial, it was for the jury to weigh all of the evidence, evaluate its credibility, and determine Defendant's

24

guilt. *See* UJI 14-5050 NMRA (directing the jury to give expert testimony the weight it deserves).

{30}     The presence of THC in Defendant's blood, the SFSTs, the circumstances of the crash, and Defendant's admission to using marijuana were relevant to impairment by marijuana. The State established that this additional evidence, together with the scientific evidence that marijuana can cause impaired driving, was reliable. As a result, the district court performed its gatekeeping function, and did not abuse its discretion when it (1) excluded any evidence of a particular level of THC causing driving impairment; and (2) admitted the expert's opinion that based on "all the factors," Defendant was impaired by marijuana. *Cf. State v. Martinez*, 2020-NMCA-043, ¶ 47, 472 P.3d 1241 (concluding that it was not plain error to admit a toxicologist's opinion on impairment by alcohol based on expertise in "the effects of a drug or drugs on a person" and "toxicology results, [the defendant's] driving behavior, and [the defendant's] interactions with [law enforcement] at the hospital," despite alternative explanations for the defendant's behavior).

## II.     Substantial Evidence Supports the Jury's Finding That Defendant Was Impaired by Drugs

{31}     Defendant additionally challenges the sufficiency of the evidence supporting the conviction. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a

conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). This Court will "view the evidence in the light most favorable to the state, resolving all conflicts therein and indulging all permissible inferences therefrom in favor of the verdict," to conclude "whether the evidence, viewed in this manner, could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *State v. Storey*, 2018-NMCA-009, ¶ 45, 410 P.3d 256 (internal quotation marks and citation omitted). Any evidence that supports a different result "does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

{32}    Defendant only challenges the first element of vehicular homicide—as the jury was instructed, whether there was sufficient, admissible evidence to show that Defendant operated a motor vehicle while "under the influence of marijuana and/or methadone[,] a drug." *See* UJI 14-240B NMRA (defining the elements of "[h]omicide by vehicle; driving under the influence"). Defendant argues that there was insufficient evidence because a showing of marijuana and methadone in the bloodstream does not necessarily establish impairment and the SFSTs cannot be treated as scientific tests to measure marijuana impairment. Viewing the evidence in the light most favorable to the guilty verdict, we conclude that the jury reasonably

26

found that Defendant operated a motor vehicle while under the influence of marijuana and/or methadone.

{33} Defendant admitted that she took marijuana and methadone in the morning before driving her brother to an appointment and hitting Victim with the truck on the way home in the afternoon. Defendant did not recall hitting Victim and the road showed no signs that the truck's brakes engaged at all before hitting another car. As we have explained, the expert connected the Sergeant's observations made during the SFSTs to impairment by marijuana, and during the SFSTs, Defendant struggled to follow instructions and maintain her balance. Although Defendant presented evidence that she hit Victim with the truck because she suffered from a lack of sleep and a possible seizure disorder, in light of the verdict, we assume the jury rejected her version of the facts. *See Rojo*, 1999-NMSC-001, ¶ 19. We hold that the State's evidence was sufficient to support the jury's conclusion that Defendant was under the influence of marijuana and/or methadone to such a degree that rendered her incapable of safely driving a vehicle. *See* UJI 14-240B.

**III.   The District Court Did Not Erroneously Deny Defendant's Proposed Jury Instructions**

{34} Defendant last argues that the district court improperly refused requested jury instructions regarding diminished capacity, conscious wrongdoing, and an expanded elements instruction that included both. Specifically, Defendant requested that the instructions allow the jury to consider whether Defendant (1) knew that using

27

marijuana and/or methadone would impair her ability to safely operate a vehicle; (2) could know the dangerousness of her conduct; and (3) believed that taking marijuana and methadone as prescribed would impair her ability to safely operate a motor vehicle. In the brief in chief, Defendant additionally challenged the district court's denial of an instruction relating to the "inability to form a deliberate intention," but Defendant abandoned that challenge in the reply brief and regardless, Defendant withdrew the proposed instruction on this topic in the district court. Otherwise, because Defendant preserved the jury instruction challenges at trial, we review for reversible error and consider "whether a reasonable juror would have been confused or misdirected by the jury instruction[s]." *See State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks and citation omitted).

{35}    "[J]uror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Id.* While we agree with Defendant that reversible error can occur when a court fails to give an instruction on the defendant's theory of a case when evidence at trial supports giving that instruction, *see State v. Hertzog*, 2020-NMCA-031, ¶ 11, 464 P.3d 1090, the instructions ultimately provided by the district court ensured that the jury would consider whether Defendant knew that using the marijuana and methadone as prescribed would impair her ability to safely drive.

{36}     Specifically, the instruction that established the elements of the crime included as an element that Defendant "was not involuntarily intoxicated" or "if [D]efendant was involuntarily intoxicated, then [D]efendant nonetheless knew what she was doing or understood the consequence of her act." The jury was additionally instructed that "[i]ntoxication is involuntary if: a person becomes intoxicated by using drugs without knowing the intoxicating character of the drugs and without willingly assuming the risk of possible intoxication." Thus, the instructions required the jury to determine either that Defendant knew that the substance could be intoxicating or that she acted knowing what she was doing or understanding the consequences. A reasonable juror therefore would not have been confused or misdirected in the absence of Defendant's requested jury instructions, and the instructions given allowed the jury to fully consider Defendant's theory of the case. We therefore hold that the district court did not erroneously deny Defendant's requested jury instructions.

**CONCLUSION**

{37}     For the above reasons, we affirm.

{38}     **IT IS SO ORDERED.**

_____

**KATHERINE A. WRAY, Judge**

29

**WE CONCUR:**

_____
**KRISTINA BOGARDUS, Judge**


_____
**SHAMMARA H. HENDERSON, Judge**