This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-41629**

**STATE OF NEW MEXICO,**

　　Plaintiff-Appellee,

v.

**MARQUI NIKOLE ARMSTRONG
a/k/a MARQUI ARMSTRONG,**

　　Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF MCKINLEY COUNTY
R. David Pederson, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Walter Hart, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**WRAY, Judge.**

**{1}** A jury convicted Defendant of (1) possession of a controlled substance, (methamphetamine), contrary to NMSA 1978 Section 30-31-23(A), (E) (2021); and (2) trafficking a controlled substance (fentanyl), contrary to NMSA 1978 Section 30-31-20 (2006). Defendant makes three arguments on appeal. We conclude the following: (1) assuming that the investigating officer provided expert testimony, the foundation for the

officer's qualifications was sufficient under the circumstances to avoid plain error and permitting the testimony was not otherwise error; (2) fundamental error did not arise from the State's reference in closing argument to the general intent jury instruction; and (3) the search warrant affidavit established probable cause to search Defendant's residence. We therefore affirm.

## DISCUSSION

**{2}** Because this is a memorandum opinion, we reserve our discussion of the factual background for that necessary to explain our analysis.

## I.  The Investigating Officer's Trial Testimony

**{3}** Defendant's first argument relates to whether the testimony of the investigating officer (the officer) was improper expert testimony. The parties do not dispute that this issue was not preserved and is therefore subject to plain error review. *See State v. Contreras*, 1995-NMSC-056, ¶ 23, 120 N.M. 486, 903 P.2d 228 (noting that appellate courts review unpreserved evidentiary objections for plain error). "Under the plain error rule, there must be (1) error, that is (2) plain, and (3) that affects substantial rights." *State v. Gwynne*, 2018-NMCA-033, ¶ 27, 417 P.3d 1157 (internal quotation marks and citation omitted). Defendant maintains that the admission of the officer's testimony was plainly erroneous, cumulatively affected substantial rights, and undermined the right to a fair trial. *See State v. Stanley*, 2001-NMSC-037, ¶ 43, 131 N.M. 368, 37 P.3d 85 ("Under the cumulative error doctrine, we consider whether the cumulative effect of the errors was so prejudicial that [the d]efendant was deprived of a fair trial.").

**{4}** Whether there was error at all is the starting point for reversible, plain, and cumulative error analysis. *See State v. Smith*, 2016-NMSC-007, ¶ 46, 367 P.3d 420 (explaining reversible error); *Gwynne*, 2018-NMCA-033, ¶ 27 (noting that the first criteria for plain error is that "there must be . . . error"); *State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 ("Where there is no error to accumulate, there can be no cumulative error." (alteration, internal quotation marks, and citation omitted)). Defendant's assignments of error implicate the expert testimony requirements found in Rule 11-702 NMRA and whether the officer's testimony (1) created an improper profile of drug traffickers, (2) was "unduly prejudicial under Rule 11-403 NMRA," and (3) resulted in an inadmissible opinion about the ultimate issue that was for the jury to decide. We begin with Rule 11-702, explain how the profile and prejudice arguments are tied to the Rule 11-702 arguments, and then address the ultimate issue question.

## A.  The Requirements of Rule 11-702

**{5}** Rule 11-702 generally governs the admissibility of expert testimony. The rule permits a witness to "testify in the form of an opinion," *id.*, subject to three requirements: "(1) that the expert be qualified; (2) that the testimony be of assistance to the trier of fact; and (3) that the expert's testimony be about scientific, technical, or other specialized knowledge with a reliable basis." *State v. Yepez*, 2021-NMSC-010, ¶ 19,

483 P.3d 576 (internal quotation marks and citation omitted). It is the role of the district court "to ensure that the proffered expert evidence meets the foregoing requirements." *Id.* Based on this rule, Defendant argues the following: the officer's testimony was expert testimony; the officer was not properly tendered or accepted as an expert; the officer was not qualified to provide some of the testimony; and the testimony did not assist the trier of fact.

**{6}** We need not decide whether all of the officer's testimony that Defendant challenges was expert testimony. Much of the officer's testimony was opinion testimony that was based on the officer's experience and training. And on appeal, the State does not contest that the officer's testimony was expert testimony but instead argues that no plain error arose from the failure to formally tender and recognize the officer as an expert and that regardless, the officer was qualified to provide expert testimony. We therefore assume that some of the officer's testimony was expert testimony and continue our analysis.

**{7}** To the extent that Defendant maintains that the absence of a formal tender and recognition of the officer as an expert was plain error, we disagree. A district court need not signal its "acceptance of a witness as an expert" by using "formal, talismanic words," instead "a witness may testify as an expert as long as the circumstances are such that the parties are on notice of the court's acceptance of that witness as an expert." *State v. Bullcoming*, 2010-NMSC-007, ¶ 30, 147 N.M. 487, 226 P.3d 1, *rev'd on other grounds, Bullcoming v. New Mexico*, 564 U.S. 647, 652, 658 (2011). The *Bullcoming* defendant objected to the expert's testimony but the district court did not rule on the issue, and as a result, the Court focused on whether the parties had notice that the district court had accepted the witness as an expert despite no formal acceptance. *Bullcoming*, 2010-NMSC-007, ¶ 30. In the present case, Defendant did not object and as a result, the district court did not indicate its position on the matter. Nevertheless, assuming that the absence of formal or informal tender and acceptance was error, it was not plain error because as we explain, the record reflects that the parties and the district court were "on notice" that the officer's testimony was based in part on his specialized knowledge and training. *See id.*

**{8}** The State began the officer's testimony by asking a series of questions about his experience and training with drug investigations. During direct testimony, the officer testified repeatedly based on his experience and training, and some of Defendant's questions during cross-examination were also premised on the officer's experience and training. Thus, the record demonstrates that the parties were on notice that the testimony was based on both the officer's experience and training in drug investigations and his factual knowledge about the investigation. As a result, we discern no plain error in permitting the officer's expert testimony without tender and acceptance. *See Gwynne*, 2018-NMCA-033, ¶ 27 (explaining that plain error applies when "an error . . . infects the fairness or integrity of the judicial proceeding" (internal quotation marks and citation omitted)).

**{9}** The record also does not support Defendant's arguments that the officer was not qualified to opine about "'drug dealer' behaviors" and did not describe "any particular expertise in fentanyl beyond his discussions with users and informants about how many pills they take in a day." *See Yepez*, 2021-NMSC-010, ¶ 19 (requiring that "the expert be qualified" (internal quotation marks and citation omitted)). The officer testified that he had been a law enforcement officer for "eighteen going on nineteen years," with about "nine to ten" of those years primarily spent in the narcotics division. The officer received specific training regarding narcotics, surveillance, and controlled and undercover drug buy operations. He testified to his experience in handling between 200 to 300 narcotic and trafficking cases during his time with the narcotics division, which included "controlled buys, undercover buys, and controlled deliveries." Although the officer testified directly that he was trained "about illicit drugs like cocaine, marijuana, [and] methamphetamine," he also testified that he recognized fentanyl pills because "as a narcotics officer, . . . we deal and buy and sell in them." The officer further explained:

> A lot of our addicts, when you speak with them and you talk with them and you get to know them, especially us working in narcotics—we do that a lot. When we talk to these guys that are overdosing stuff, especially on newer drugs like fentanyl, they're utilizing one to five pills a day, depending on their tolerancy. And that's on an average.

This testimony demonstrates that the officer's training and experience (1) encompassed drugs generally and fentanyl specifically, (2) included participation in controlled buys and surveillance, and (3) involved exposure to quantities common for personal users. *See State v. Rael-Gallegos*, 2013-NMCA-092, ¶¶ 21-24, 308 P.3d 1016 (considering experience and training sufficient to support opinions about "personal use amounts versus trafficking amounts"). We therefore conclude that the officer was sufficiently qualified, and there was no error in permitting the testimony. *See id.* ¶ 20 ("[I]n determining whether to admit non-scientific expert testimony, the [district] court must evaluate the expert's personal knowledge and experience to determine whether the expert's conclusions on a given subject may be trusted" (alteration, omission, internal quotation marks, and citation omitted)).

**{10}** Defendant's last argument related to Rule 11-702 is that the officer's expert testimony did not assist the trier of fact. As we explain, this argument is related to Defendant's other arguments about profile evidence and Rule 11-403, and we therefore consider all three together.

**B. Profile Evidence, Rule 11-702, and Rule 11-403**

**{11}** To argue that the officer's testimony was improper, Defendant collects statements made by the officer spread throughout his testimony and summarizes those statements out of the original context as a cohesive "drug dealer profile" or a prejudicial narrative. The profile that Defendant attributes to the officer defined small drug dealer-users as people who (1) use firearms, (2) create danger for law enforcement with exterior surveillance, (3) use interior surveillance to identify police informant buyers, (4)

supply a form of nonpharmaceutical fentanyl that has a particularly high risk of overdose, (5) are unemployed and support their habits by stealing and pawning items, and (6) have cash in small bills on hand because they sell just a few pills at a time for $20 each. Defendant maintains that the officer's testimony was prejudicial and confusing because it incorporated "patterns of firearms use, danger to police, drug users as petty thieves, and a disregard for human life based on selling drugs that cause frequent overdoses," which suggested to the jury that the officer believed that Defendant met the small drug-dealer profile. In this context, Defendant makes three arguments. First, Defendant argues that the officer's testimony created an improper small dealer-user profile. Second, Defendant maintains that the officer's testimony did not assist the jury, as required by Rule 11-702, to determine whether Defendant had the intent to transfer or use the 74 fentanyl pills found in her bathroom. Third, Defendant asserts that contrary to Rule 11-403, the small dealer-user profile was unduly prejudicial. As we explain, we view the record differently.

**{12}** After the State elicited the officer's experience and training, he described the surveillance of Defendant's house and relayed the circumstances of the execution of the warrant. The officer testified to his observations during the operation—foot traffic, surveillance equipment, firearms, unused clear plastic baggies, currency, a digital scale, a substance that appeared to be methamphetamine, and 74 pills that the officer recognized as fentanyl pills. The State asked why these observations were significant, and the officer explained how observations like these were "indicative" of drug sales or suggested drug sales when considered in combination with other observations. Although some of the evidence indicated drug use, the officer opined, "[I]t's not unindicative for a user to be a seller as well."

**{13}** Based on the trial record, the officer's testimony was not profile evidence of the type that Defendant argues has been rejected by other jurisdictions.[1] *See State v. Ketchner*, 339 P.3d 645, 647 (Ariz. 2014) (explaining that improper profile evidence "tends to show that a defendant possesses one or more of an informal compilation of characteristics or an abstract of characteristics typically displayed by persons engaged in a particular kind of activity" (internal quotation marks and citation omitted)); *see also Commonwealth v. Morris*, 974 N.E.2d 1152, 1161 (Mass. App. Ct. 2012) (explaining that "[a]n expert must not profile or describe the typical attributes of the perpetrators of crimes" (internal quotation marks and citation omitted)). The testimony, viewed in context, did not, as Defendant argues, correlate trafficking with "user behavior" or other noncriminal behavior—behavior like keeping firearms in the home, using surveillance equipment, having cash in her purse, and possessing 74 fentanyl pills when users rarely have sufficient funds to have that many pills on hand. The officer did not describe "an abstract of characteristics" that he had correlated to people who have been convicted

---

[1]It appears that New Mexico courts have not yet considered or adopted a general prohibition on profile evidence. *See Lytle v. Jordan*, 2001-NMSC-016, ¶¶ 19, 35-37, 130 N.M. 198, 22 P.3d 666 (suggesting that had pedophilia profile evidence been offered, it may not have been admissible based on relevance, prejudice, and the strictures of Rule 11-702). We need not do so today, because as we explain, the officer's testimony in the present case was not profile evidence, was relevant, not unduly prejudicial, and assisted the trier of fact. *See id.* ¶ 35 (describing the bases on which other jurisdictions have excluded profile evidence).

for trafficking and then match that profile to aspects of Defendant's character. *See Ketchner*, 339 P.3d at 648 (rejecting testimony that only "invite[d] the jury to find that [the defendant's] character matched that of a domestic abuser"); *see also* Rule 11-404(B)(1) NMRA (prohibiting the use of evidence "to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character"). Instead, the officer described his observations in surveilling Defendant's home and executing the warrant, and rather than describing a typical drug dealer, the officer explained how what he saw aligned with typical aspects of trafficking. *See Morris*, 974 N.E.2d at 1161 (distinguishing testimony impermissibly "describing an abuser" from permissible testimony "describing typical acts of abuse"); Rule 11-401 NMRA (explaining that relevant evidence "has any tendency to make a fact [of consequence] more or less probable"). Thus, even if New Mexico adopted a general prohibition on profile evidence, the officer's testimony in the present case was relevant and not of the type that has been viewed as improper profile evidence and its admission was not error.

**{14}**    Nor are we persuaded to adopt Defendant's summarization of the officer's testimony and based on that, conclude that the testimony did not assist the trier of fact or was unduly prejudicial. *See* Rule 11-702 (requiring expert testimony to "help the trier of fact to understand the evidence or determine a fact in issue"); *Stanley*, 2001-NMSC-037, ¶ 17 (noting that the reference to "[u]nfair prejudice" in Rule 11-403 "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one" (internal quotation marks and citation omitted)). Rather than delivering a prejudicial and confusing narrative, the officer explained how his observations and the items found could relate to drug trafficking. When describing his observations in executing the warrant, the officer testified that (1) dealers have firearms to protect themselves and their product; (2) cameras like those affixed to the outside of Defendant's house warn of officers approaching the building and can be a threat to the safety of officers; (3) a "normal everyday user" uses small bills because they do not have jobs, are not "productive members of society," and "get their money by other means, stealing things" and "pawning items" for small bills; (4) a small dealer is generally paid twenty dollars a pill for a few pills at a time; and (5) fentanyl can cause overdose in very small quantities—in the officer's words, "we've got addicts smoking one pill and overdosing." These statements were spread throughout the officer's testimony that addressed specific types of evidence, in the context of both describing the search and explaining why discovering certain evidence was significant. When the testimony is considered in context, the officer did not testify about attributes of people who are drug dealers, as Defendant asserts, but instead based on his training and experience, explained why certain items found in Defendant's home were "indicative of drug sales." As a result, the officer provided information that was both outside the knowledge of a typical layperson and probative of the crime of trafficking. *See State v. Becerra*, 1991-NMCA-090, ¶ 23, 112 N.M. 604, 817 P.2d 1246 ("We do not believe that a jury could use 'common knowledge' to determine if the amount was too much for personal use (as it might with respect to liquor or cigarettes)."). In context, the testimony assisted the trier of fact and its probative value was not substantially outweighed by any undue prejudice.

**{15}** Defendant makes an additional argument related to prejudice and maintains that the prejudice from the officer's testimony was heightened when in closing argument the State highlighted the "profile" evidence to connect the officer's testimony to Defendant as a "small dealer/user." The State's arguments, however, generally mirrored the officer's testimony. Regarding the trafficking charges, the State first broadly stated, "As you have seen the evidence, [Defendant] is what is referred to as a small-time dealer/user." The State described the officer's training and experience about how "to distinguish between a regular user and a seller and a small-time seller versus a big-time seller," and then continued to recap the officer's testimony about why the evidence discovered were "characteristics" of a small dealer. The State's closing arguments used the officer's expertise to explain why the jury should find that the evidence demonstrated that Defendant was a small dealer—or put another way, that Defendant engaged in drug trafficking. *See* UJI 14-104 NMRA (instructing the jury that closing argument "is an opportunity for the lawyers to discuss the evidence and the law as [the court has] instructed"). We therefore conclude that Defendant has not demonstrated that the officer's testimony was unfairly prejudicial.

**{16}** For these reasons, we conclude that Defendant's view that the testimony created an improper profile, or a prejudicial narrative, disregards the sequence and context of the officer's testimony. Considering the testimony as a whole, we discern no improper profile evidence and conclude that the testimony assisted the trier of fact and was not unduly prejudicial. As a result, allowing the testimony was not error.

## C.    Impinging on the Jury's Role With "Ultimate Issue" Testimony

**{17}** Defendant's last argument regarding the officer's testimony relates to Rule 11-704 NMRA, which permits an expert to "testify on matters that embrace ultimate issues of fact." *See Rael-Gallegos*, 2013-NMCA-092, ¶ 33 (alteration, internal quotation marks, and citation omitted). Nevertheless, no witness, "testifying as an expert or otherwise," may "state their opinion of the defendant's guilt." *Id.* ¶ 29. This Court has observed that "[b]ased on the amounts of drugs possessed, it is difficult to determine when an expert crosses the fine line constituting error when testifying about whether the person possessing drugs intends to use or traffic those drugs." *Id.* ¶ 35; *compare* UJI 14-3102 NMRA (defining the elements of possession of controlled substances), *with* UJI 14-3104 NMRA (including a single additional element for trafficking with intent to distribute, that "[t]he defendant intended to transfer [a controlled substance] to another"). Defendant argues that the officer crossed that line in the present case. Specifically, Defendant contends that the officer's testimony went directly to the ultimate issue for the jury because it (1) tied the evidence to a "small dealer/user profile"; (2) opined that the drugs found "were not for personal use"; (3) justified the officer's charging decision; and (4) identified drug items as belonging to Defendant rather than another occupant of the house.

**{18}** Again, we view the officer's testimony differently. The officer repeatedly described why the evidence was "indicative" of drug sales. The officer's opinion that the quantity of fentanyl pills found "was not for personal use" was tied his experience that

the quantity found could be fatal—but the officer also acknowledged in his testimony that a single pill could be fatal and that the quantity alone was not by itself indicative of trafficking. Thus, this opinion was not that Defendant had trafficked because of the quantity, but that the quantity was another indicator of trafficking. The officer also defended the decision to charge Defendant with trafficking. This Court has suggested that such evidence could be proper. *See Rael-Gallegos*, 2013-NMCA-092, ¶¶ 32-33 (determining that "[t]o the extent [the officer's] testimony embraced the ultimate issue by educating the jury in regard to what factors, in [the officer's] experience, warranted a trafficking charge, it was nevertheless admissible"). To the extent the officer came close to the line of propriety in the present case, Defendant suggested on cross-examination that the officer was looking for evidence to charge Defendant with trafficking and to refute that line of questioning, during redirect examination the State asked the officer to put the evidence that was found in the context of the charging decision. The officer also testified that certain items were associated with Defendant "as a suspect" on the evidence envelope and about why, as a factual matter, he had no doubt that particular items belonged to Defendant rather than a third party, based on where those items were found in the house and how the items of evidence were labelled. Defendant suggests that this testimony has the same improper effect as hypothetical testimony that our Supreme Court considered in *State v. Ashley*, 1997-NMSC-049, ¶¶ 18-20, 124 N.M. 1, 946 P.2d 205. In the present case, however, unlike in *Ashley*, the State did not present a hypothetical that mirrored the evidence presented, ask whether the charged crime would have occurred under the hypothetical facts, and elicit a specific answer from the officer that resulted in an implication "that guilt ha[d] been determined by a judicial officer." *See id.* ¶ 18.

**{19}** The officer did not testify directly or hypothetically that Defendant was guilty of trafficking or that Defendant possessed the drugs that were found in the residence with the intent to distribute. Instead, the officer's testimony explained the investigation and the officer's charging decisions. In the context of Rule 11-704, we have noted that cross-examination and rebuttal expert witnesses are "the traditional and appropriate means of attacking shaky but admissible evidence." *Rael-Gallegos*, 2013-NMCA-092, ¶ 34 (internal quotation marks and citation omitted). The testimony "did not detract from the jury's ability to independently draw conclusions based on all of the evidence presented at trial." *See id.* Accordingly, permitting the testimony was not error.

## D.    Cumulative Error

**{20}** Defendant contends that it was cumulative plain error for the district court to allow the officer's testimony, which (1) was not offered or admitted as expert testimony; (2) contained improper profile evidence; (3) went to the ultimate issue and acted as "a quasi-pronouncement of guilt"; and (4) was "essentially dispositive" because it came from the State's only fact witness. The cumulative error doctrine does not apply if "the record as a whole demonstrates that the defendant received a fair trial." *State v. Trujillo*, 2002-NMSC-005, ¶ 63, 131 N.M. 709, 42 P.3d 814 (internal quotation marks and citation omitted). In our analysis, we have assumed that the officer testified as an expert and that the failure to tender and accept the officer as an expert was erroneous. As to

Defendant's other arguments, we have concluded that allowing the officer's testimony was not error. In light of the single unpreserved error that did not affect Defendant's substantial rights, *see Gwynne*, 2018-NMCA-033, ¶ 27 (defining plain error), we conclude that that Defendant received a fair trial and cumulative error therefore does not require a new trial.

## II.     The General Intent Jury Instruction and Fundamental Error

**{21}**     The district court in the present case gave the jury a general intent jury instruction. *See* UJI 14-141 NMRA ("General criminal intent."). Defendant did not object but argues on appeal that the instruction resulted in fundamental error because trafficking by possession with intent to distribute is a specific intent crime. *See State v. Office of Pub. Defender ex rel. Yazzie*, ___-NMSC-___, ¶¶ 20-21, ___ P.3d ____ (S-1-SC-39553 Apr. 7, 2025) (describing the distinction between general and specific intent). Defendant recognizes that "[o]rdinarily, instructing general intent for a specific intent crime will not, on its own result in fundamental error." *See State v. Gee*, 2004-NMCA-042, ¶¶ 16-17, 135 N.M. 408, 89 P.3d 80 (considering the instructions as a whole "under a fundamental error analysis" and concluding that "[e]ven with the general intent instruction, the instructions when read as a whole, did not deprive [the d]efendants of an essential part of their defense"). Nevertheless, Defendant maintains that because her intent was the primary element in dispute at trial and the State discussed general intent in closing argument, "a reasonable juror" would have been "confused regarding the requisite intent" and the State's arguments "fully negate[d] the specific intent requirement." On those grounds, Defendant argues that "[f]undamental error justifies reversal because of the probability that an inaccurate rendition of the relevant law confused or misdirected the jury on the primary disputed element at trial." *See State v. Arrendondo*, 2012-NMSC-013, ¶ 21, 278 P.3d 517 (explaining that when reviewing for fundamental error, "we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction" (internal quotation marks and citation omitted)); *State v. Sosa*, 2009-NMSC-056, ¶ 35, 147 N.M. 351, 223 P.3d 348 ("Fundamental error occurs when prosecutorial misconduct in closing statements compromises a defendant's right to a fair trial" and "the prosecutor's conduct created a reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." (internal quotation marks and citation omitted)).

**{22}**     The State's reference to the general intent instruction in closing argument did not result in fundamental error. In closing argument, the State read the jury the elements instruction for trafficking and argued that the evidence satisfied each of the elements, including that "Defendant intended to transfer to another." A few minutes later, the State read the general intent instruction to the jury and then stated, "So again, even if she didn't know what she was doing is in fact trafficking, it does not matter. The law says you committed the act and therefore you violated the law, and then says, well infer from all of the circumstances—surrounding circumstances. Use your common sense. What did you hear?" The State's correct assertion that it was required to prove "intent to transfer" was not contradicted by the later general intent statement—that Defendant

need not know that what she was doing was "in fact trafficking." *See* UJI 14-141, comm. cmt. (explaining that the adoption of the general intent instruction superseded authority suggesting "that a general criminal intent instruction is inconsistent with an instruction which contains the element of intent to do a further act or achieve a further consequence, the so-called specific intent element"); *cf. Gee*, 2004-NMCA-042, ¶ 18 ("The committee commentary specifically rejects [the d]efendants' position that the general intent instruction is inconsistent with a specific intent instruction."). Because the jury instruction together with the State's closing argument did not affect Defendant's essential right to a defense or undermine the basis for Defendant's case, we discern no fundamental error. *See Gee*, 2004-NMCA-042, ¶ 8 (describing the circumstances in which fundamental error requires reversal).

### III. Probable Cause to Support the Search Warrant

**{23}** Last, Defendant renews the argument made by pretrial motion that the search warrant affidavit was not supported by probable cause. We review the issuing court's decision to approve a search warrant "under a substantial basis standard." *State v. Haidle*, 2012-NMSC-033, ¶ 10, 285 P.3d 668; *see also State v. Vest*, 2011-NMCA-037, ¶ 8, 149 N.M. 548, 252 P.3d 772 ("[W]e look at the magistrate's conclusions, not the district court's." (internal quotation marks and citation omitted)). This standard is "more deferential than the de novo review applied to questions of law, but less deferential than the substantial evidence standard applied to questions of fact." *Haidle*, 2012-NMSC-033, ¶ 10 (internal quotation marks and citation omitted).

**{24}** Similarly, "[t]he degree of proof necessary to establish probable cause for the issuance of a search warrant is more than a suspicion or possibility but less than a certainty of proof." *Vest*, 2011-NMCA-037, ¶ 7 (internal quotation marks and citation omitted). When an affidavit is based on information provided by confidential resources, as in the present case, the affidavit must establish a factual basis for the informant's knowledge and veracity. *See id.* ¶ 12. On appeal, Defendant focuses on the veracity portion of the test. The veracity prong "requires that facts be presented to the court to show either that the informant is inherently credible or that the information from the informant is reliable on this particular occasion." *Id.* (internal quotation marks and citation omitted). Defendant maintains that the affidavit did not demonstrate that any confidential resource was reliable because law enforcement officers did not corroborate any confidential resources's hearsay statements.[2] To evaluate this contention, we turn to the contents of the affidavit.

**{25}** The affidavit sought to search the premises at a particular address as well as Defendant's person. After setting forth the items to be seized and establishing the affiant's professional training as an officer, the affidavit asserted the following:

---

[2]Two of Defendant's specific arguments relate to the district court's findings regarding probable cause. We, however, review whether the affidavit supported the issuing court's probable cause determination. *See Vest*, 2011-NMCA-037, ¶ 8. For this reason, we focus on Defendant's arguments relating to the sufficiency of the affidavit.

In the months of September through November, 2021, Affiant along with Agents from Gallup Police Department Narcotics Division conducted five operations targeting [Defendant]. All five times that the operation was conducted confidential resources were utilized. The confidential resources proved reliable as he/she was used several times on other operations and which resulted in successful prosecution and convictions of those cases.

The affidavit continues to describe each of the five operations, in which the confidential resource was searched each time for contraband and money prior to the controlled buy and was provided with currency to make the purchase of the alleged contraband. The confidential resource entered the premises, came out a short time later, was searched, and turned over contraband—suspected fentanyl or methamphetamine—to the agents. No currency was found on the confidential resource at the end of each controlled buy. The affidavit noted that during surveillance of the premises, "several subjects known to Agents to be illegal narcotics users enter the residence for only a few minutes and leave."

**{26}**    The hearsay contained in the affidavit appears to be limited to the confidential resource's identification of Defendant as the person who sold the drugs. For each controlled buy, the affidavit identifies Defendant as a target of the search, states that the confidential resource met with Defendant, asserts that "surveillance was ongoing both with the confidential resource and [Defendant]," notes that the confidential resource entered the premises and "stayed for a short period of time," and indicates that the confidential resource purchased the contraband from Defendant. The crux of Defendant's argument is that "[b]ecause the officer-affiant did not enter and could not see inside the house, there is no way to know whether the informant's hearsay account of the controlled buys tracked the affidavit's assertions."

**{27}**    We need not determine whether the confidential resource reliably reported that drugs were purchased from Defendant during the controlled buys, because based on the affiant's observations of the five operations—a confidential resource took money into the residence and came out with drugs and no money—probable cause existed to search the residence. *See State v. Williamson*, 2009-NMSC-039, ¶ 31, 146 N.M. 488, 212 P.3d 376 ("Probable cause exists when there are reasonable grounds to believe that an offense has been or is being committed in the place to be searched" (internal quotation marks and citation omitted)); *Vest*, 2011-NMCA-037, ¶ 19 (explaining that if an affidavit does not establish an informant's credibility based on one set of facts asserted in the affidavit, "this deficiency is not fatal to a probable cause determination if the affidavit otherwise demonstrates the credibility or reliability of the informant's information"). Defendant contends that the confidential resource's allegations "of prior transactions involving [Defendant]" tainted the affidavit's basis to search both her person and the residence, because the residence is "where those transactions were alleged to have occurred." We disagree, because generally a warrant is considered tainted and resulting evidence suppressed when the warrant was based at least "partially on tainted information gathered during a prior illegal search." *See State v. Trudelle*, 2007-NMCA-066, ¶ 40, 142 N.M. 18, 162 P.3d 173 (internal quotation marks

and citation omitted). Defendant has not asserted, and the record does not suggest, that the affidavit was tainted by unconstitutionally obtained information. Instead, Defendant argues that the affidavit did not provide sufficiently substantiating facts to support the confidential resource's identification of Defendant.

{28}    The affidavit contained other information, apart from the confidential resource's identification of Defendant, and it is our role to review the warrant affidavit "as a whole, and the reasonable inferences that may be drawn therefrom," in order to determine whether the facts asserted in the affidavit provide "a substantial basis for determining that there is probable cause to believe that a search will uncover evidence of wrongdoing." *See Williamson*, 2009-NMSC-039, ¶ 29. The affiant personally participated in the five operations that resulted in an exchange of drugs for money in the residence that was verified by searching the confidential resource before and after the operation. That information was sufficient to establish probable cause to search the residence, which was not undermined by any other deficiency of facts in the affidavit that were related to the identification of Defendant by a confidential resource as the person trafficking drugs. The record does not indicate whether Defendant's person was searched pursuant to the warrant or if so, whether any evidence was recovered from such a search that Defendant seeks to have suppressed. We therefore affirm and hold that there was a substantial basis for the magistrate court's determination that probable cause supported the warrant to search the residence.

**CONCLUSION**

{29}    We affirm.

{30}    **IT IS SO ORDERED.**

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

**JANE B. YOHALEM, Judge**

**KRISTOPHER N. HOUGHTON, Judge**